# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff/Respondent,

v.                                       No. CIV 12-1035 RB/LFG
                                       No. CR   11-1163 RB

FRANCISCO ADAN LOPEZ,

        Defendant/Movant.

## MAGISTRATE JUDGE'S FINDINGS
## AND RECOMMENDED DISPOSITION[1]

### Findings

1.      On October 4, 2012, Movant Francisco Adan Lopez ("Lopez") filed a motion to

vacate, set aside or correct sentence by a person in federal custody, under 28 U.S.C. § 2255. [Doc.

1.][2] Lopez is represented by counsel.  On November 1, 2012, the United States filed a response to

---

[1]Within fourteen (14) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations.  A party must file any objections with the Clerk of the U.S. District Court within the fourteen-day period allowed if that party wants to have appellate review of the findings and recommendations.  If no objections are filed, no appellate review will be allowed.  *See, e.g.,* Wirsching v. Colorado, 360 F.3d 1191, 1197 (10th Cir. 2004) ("firm waiver" rule followed in Tenth Circuit holds that a party who fails to object to magistrate judge's findings and recommendations in timely manner waives appellate review of both factual and legal questions).

[2]Lopez's § 2255 motion, supporting brief and multiple exhibits consist of almost 550 pages.  The Court considered, in particular, the motion, brief, exhibit D (containing the plea agreement and transcript of the plea hearing), and affidavits.  However, the majority of exhibits were unnecessary and should not have been attached in support of the § 2255 motion, including published court opinions, statutes, law review articles, life insurance application, pay stubs, tax returns, letters of support, certificates of achievement, social security information, marriage license, birth certificates, family photographs, and travel warnings for Mexico. [Doc. 1, Exs. A-J.] Most of the attachments do not pertain to the legal issues before the Court.

the § 2255 motion.  [Doc. 8].  On November 14, 2012, Lopez filed a reply. [Doc. 9.] Lopez is currently incarcerated in relation to a federal criminal conviction.

2.      In making its findings and recommendation on this matter, the Court examined all of the pertinent pleadings and attachments in this civil proceeding and the related criminal case [No. CR 11-1163].[3]  Specifically, the Court reviewed Lopez's plea agreement [Doc. 1, Ex. D2; Doc. 46 in No. CR 11-1163], the Judgment [Doc. 1, Ex. D12], and the transcript of the plea hearing before United States Magistrate Judge Lourdes A. Martinez [Doc. 1, Ex. D17.]  Because it is possible to resolve the issues on the pleadings, and the record establishes conclusively that Lopez is not entitled to relief, the Court decides that no evidentiary hearing is necessary.  *See* 28 U.S.C. § 2255; United States v. Kennedy, 225 F.3d 1187, 1193 (10th Cir. 2000), *cert. denied*, 532 U.S. 943 (2001).  After carefully considering the pleadings, attachments, argument by parties and the pertinent law, the Court recommends that Lopez's § 2255 motion be denied and dismissed, with prejudice.

3.      Lopez received his permanent resident card when he was 18 years old.  He became a Lawful Permanent Resident of the United States. [Doc. 1, Ex. A1.] Lopez and his wife have been married for 22 years.  They have three children who are citizens of the Untied States. [Doc. 1, Ex. H2, H4-H8.] Prior to his conviction, Lopez was a self-employed construction worker who paid his taxes. [Id., Ex. F112-241.] Because of his conviction, he is subject to mandatory removal proceedings.

―――――――――――

[3]The Court refers to pleadings in the criminal case as CR Doc. __; and to pleadings in the civil case as Doc. __.

**Background**

4.      On January 24, 2011, a criminal complaint was filed against Lopez and his nephew, Carlos Ivan Oquedo-Flores ("Carlos" or "Oquedo") [*see* Doc. 8, Ex. 2, at ¶ 2], charging them with violations of 21 U.S.C. §§ 841 and 846 (conspiracy to possess with intent to distribute five kilograms and more of a mixture containing a detectable amount of cocaine and possession with intent to distribute five kilograms or more of the same mixture. [CR Doc. 1.]  In early February 2011, Lopez retained private counsel, Joseph J. Rey, Jr. [CR Docs. 18,  24.] On May 5, 2011, a two-count Information was filed against Lopez (and Oquedo). [CR Doc. 41.]

5.      On May 5, 2011, Lopez knowingly and voluntarily consented to enter into a plea agreement before Magistrate Judge Martinez.  A waiver of indictment and Lopez's written plea agreement were filed that same day. [CR Docs. 43, 45, 46.]

6.      According to the plea agreement, Lopez admitted to the following facts related to the charges against him:

> On January 20, 2011, in Otero County in the District of New Mexico . . ., Oquedo-Flores and Francisco Lopez approached the U.S. Border Patrol Checkpoint on Highway 54 near Alamogordo, New Mexico, in a green Ford Econoline.  The occupants of the vehicle were questioned as to their citizenship and travel plans.  The vehicle was routed to a secondary inspection where a canine alerted to the back of the vehicle.  Agents requested and received consent to scan the vehicle.  The scan uncovered anomalies in both of the rear corner panels.  A subsequent search revealed sixteen plastic-wrapped bundles containing a white powdery substance later confirmed to be cocaine. Oquedo admitted to agents in a post-*Miranda* statement that he knew there was narcotics in the vehicle and that he knew its approximate location.  Oquedo told the agents there were approximately "eight kilos" of cocaine in the vehicle.  The total weight of the cocaine in the vehicle was 9.97 kilograms.  Oquedo also told agents that Lopez knew about the cocaine, was the one to arrange the actual transport, and solicited him (Oquedo) to drive the vehicle.

[CR Doc. 46, ¶ 8.]

3

7.      On May 5, 2011, Lopez entered a plea of guilty to the Information before Magistrate Judge Martinez. [CR Doc. 48 (minutes).]

8.      The written plea agreement [CR Doc. 46] provides, in part, that Lopez knew he had the right to plead not guilty and to have a trial by jury.  Lopez agreed to waive those and other rights and to plead guilty to the two-count Information. [Id., at ¶ 3.] With respect to the minimum and maximum penalty the Court could impose, the plea agreement provided that Lopez understood he could be imprisoned for a period of not less than ten years and not more than life and that he could be subject to a fine not to exceed $10,000,000. [Id., at ¶ 4(a) and (b).] The plea agreement further informed Lopez that he could be eligible for the "safety valve" provisions provided he established eligibility; if so, Lopez would be entitled to a reduction of two levels from the base offense level and the plea agreement informed him that the sentence imposed could be less than the described statutory minimum. [Id., at ¶ 5.] The reduction, as explained, was dependent on a number of factors. [Id.]

9.      The plea agreement also stated that Lopez and the government understood that the government had not made and would not make any agreement under Rule 11(c)(1)(C), that a specific sentence was the appropriate disposition of the case. [Id., at ¶ 7(a).]

10.     Under the provision of the plea agreement identified as "Defendant's admission of facts," Lopez agreed that his signature on the plea agreement acknowledged that he was guilty of the offenses to which he was pleading guilty, that he recognized and accepted responsibility for his criminal conduct, and that he understood that the United States could prove facts sufficient to establish his guilt of the offenses, should he elect to proceed to trial.  Lopez declared under penalty of perjury that the facts recited *supra* were true and correct. [Id., at ¶ 8.]

4

11.     The parties stipulated in the plea agreement that Lopez was responsible for approximately 6 kilograms of cocaine, that he clearly demonstrated recognition and affirmative acceptance of personal responsibility for his criminal conduct, and that if he continued to do so, he was entitled to a reduction of two levels from the base offense level in calculating his sentence.  In addition, if Lopez met the requirements of U.S.S.G. § E1.1(b), the government agreed to move for a reduction of one additional level from the base offense level.  If Lopez provided a complete and truthful statement to the government concerning all information and evidence he had about the offenses, he was entitled to a reduction of two levels. [Id., at ¶ 10.]

12.     The plea agreement further stated that Lopez understood that his plea agreement was expressly contingent on co-defendant Oquedo also entering a guilty plea at the same in time, in conformity with Oquedo's individual plea agreement.  [Id., at ¶ 11.]

13.     On page 7 of the plea agreement, the following provision appears in capital letters and underlining:  "<u>IMMIGRATION REMOVAL AND OTHER IMMIGRATION CONSEQUENCES</u>." [Doc. 46, at 7.] This paragraph states that:

> Defendant recognizes that pleading guilty may have consequences with respect to defendant's immigration status if defendant is not a citizen of the United States. ...  ***Indeed, because defendant is pleading guilty to a controlled substance offense, removal is presumptively mandatory***.  Removal and other immigration consequences are the subject of a separate proceeding, however, and defendant understands that no one, including defendant's attorney or the district court, can predict to a certainty the effect of defendant's conviction on defendant's immigration status.  ***Defendant nevertheless affirms that defendant wants to plead guilty regardless of any immigration consequences that defendant's plea may entail, even if the consequences include defendant's automatic removal from the United States.***

[Doc. 46, at ¶ 13] (emphasis added).

14.     Lopez further stated that his plea of guilty was freely and voluntarily made, and not the result of force or threats or of promises apart from those set forth in the plea agreement. [Id., at ¶ 17.] The plea agreement was the complete statement of the agreement in the case. [Id., at ¶ 20.]

15.     On May 5, 2011, the Assistant U.S. Attorney signed the plea agreement, and on the same date, Lopez, along with his attorney, signed it. [Id., at 10.] Above Lopez's signature, the following paragraph is set forth:

> This agreement has been read to me in the language I understand best, and I have carefully discussed every part of it with my attorney. I understand the terms of this agreement, and I voluntarily agree to those terms.  My attorney has advised me of my rights, of possible defenses, of the sentencing factors . . ., of the relevant sentencing guidelines provisions, and of the consequences of entering into this agreement.  No promises or inducements have been given to me other than those contained in this agreement.  No one has threatened or forced me in any way to enter into this agreement.  Finally, I am satisfied with the representation of my attorney in this matter.

[Id.] Lopez's signature appears on this line above his printed name.

16.     Attorney Rey signed his name under the following paragraph:

> I am the attorney for FRANCISCO ADAN LOPEZ.  I have carefully discussed every part of this agreement with my client.  Further, I have fully advised my client of his rights, of possible defenses, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of the relevant sentencing guidelines provisions, and of the consequences of entering into this agreement.  To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

[Id.]

17.     Lopez attached to his motion a transcript of the May 5, 2011 plea hearing before Magistrate Judge Martinez. [Doc. 55, Ex. D17-D58.] A Spanish-language interpreter was present, along with Lopez's attorney, Rey.  The Magistrate Judge first addressed Defendant asking if he, along with other defendants with headsets, could hear the interpreter and noted on the record that

all defendants nodded their heads in assent.  [Id., Ex. D19.] The Court further advised defendants,

including Lopez, that it was very important that they understand the proceeding that day and to

inform the Court if there were any problems hearing or with the headset.  Lopez was sworn in before

the proceeding began.  [Id., Ex. D24.] Neither Lopez nor his co-defendant objected to having their

pleas taken during the same proceeding.

18.     During the hearing, the Magistrate Judge asked Lopez how much schooling he had

and if he could read and write Spanish.  Lopez responded "seventh" grade and that he could read

and write Spanish.  Lopez further stated that he was a resident of the United States.  [Id., Ex. D25.]

Lopez was not under the influence of alcohol, drugs or medicine that day and felt well enough to

proceed with the plea.  Lopez testified that he understood he was going to plead guilty to a felony

offense in federal court, that he had spoken to his attorney about the charges he faced and any

possible defenses he had, that he had sufficient time to go over his case with his attorney, and that

his attorney answered all questions Lopez had about his case.  [Id., Ex. D26.] Lopez was "pleased

and satisfied" with the advice and representation of counsel. [Id.]

19.     In response to questioning by the Magistrate Judge, Lopez answered that he wished

to give up his rights to trial and to plead guilty, that he understood he would not be able to change

him mind or withdraw his plea after he was sentenced, and that the copy of the Information was read

to him in Spanish. [Id.]

20.     Lopez testified that he understood the charges and understood the minimum and

maximum penalties, *i.e.,* a statutory mandatory minimum of 10 years to life in prison.  [Id., Ex. D29-

30.]

21.     In advising Lopez about the consequences of pleading guilty, the Magistrate Judge

stated:

> Mr. Lopez, one of the consequences for you is ***that based on your status in this country and the charge you're facing, it's almost certain you will be deported from this country and you won't be allowed to return again illegally without facing further and more serious Federal charges.***

[Id., Ex. 31] (emphasis added).  Lopez responded that he understood this.  [Id., Ex. D31.] The Magistrate Judge repeated some of the consequences to pleading guilty, asking if Lopez understood, particularly the terms of the minimum mandatory sentence.  Lopez stated he understood.  [Id., Ex. D32-33.]

22.     Again in response to the Court's questions, Lopez answered that nothing was promised to him, other than what the plea agreement contained, and no one forced him to plead guilty.  He was pleading guilty of his own free will.  [Id., Ex. D33-34.]

23.     With respect to Lopez's plea agreement, the Court asked if he had signed it, and Lopez responded that he had.  The Court next inquired whether the plea agreement was read to him in Spanish before he signed it.

| | |
|---|---|
| Lopez: | In Spanish? |
| Court: | Yes. |
| Lopez: | I don't remember. |
| Court: | Mr. Rey, did you read this plea agreement — |
| Rey: | Yes, I did, your Honor, and I explained each point to him. |
| Court: | Did you read it to him in Spanish? |
| Rey: | Not word for word, but I told him what every sentence said. |
| Court: | He has – it has to be read to him word for word so he can understand every provision; otherwise, it's filtered through your interpretation and you may not go over every provision.  It needs to be read to the Defendant. |
| Rey: | I believe I did read it to him and explained everything in there. |

| | | |
|---|---|---|
| Court: | | Okay, you just told me a few minutes ago you did not read it to him word for word. |
| Rey: | | I beg your pardon? |
| Court: | | You just said a few minutes ago, you did not read it to him word for word. Are you now saying that you did? |
| Rey: | | I read all the charges and everything.  I just read to him on the plea agreement. |
| Court: | | Okay.  Well, the plea agreement does contain the charge and the maximum penalty.  Did you read that part to him? |
| Rey: | | Yes.  The maximum penalty I did, and I did read to him the charge. |
| Court: | | Okay.  And did you read every other provision to him in Spanish? |
| Rey: | | Yes, ma'am. |
| Court: | | Mr. Lopez, does that refresh your memory?  Was this plea agreement read to you in Spanish? |
| Lopez: | | Yes, ma'am. |
| Court: | | Okay.  Are you sure? |
| Lopez: | | Yes, ma'am. |

[Id., Ex. D35-36.] The Court asked Lopez if he understood fully and completely each and every provision of the plea agreement.  Lopez responded that he did.

24.    During the proceeding, the Court asked Attorney Rey to explain the important provisions of the plea agreement and why counsel thought it was in Lopez's best interests to enter into the plea.  Rey responded that Lopez "is safety valve eligible," that the government agreed to remove the downward departure bar through pleading to 6 kilos of cocaine instead of 9 kilos.  "Then the 2 points for acceptance of responsibility, plus one additional point if he can proceed properly

with this plea."  [Id., Ex. D39.] If Lopez is truthful during debriefing, he was going to get an

additional two points as well. [Id.]

25.     In discussing the waiver of his appellate rights, Lopez asked the Court to clarify what

the waiver meant. [Id., Ex. D41.] The Court explained that Lopez had given up his right to appeal

by signing the plea agreement, and that, as part of the plea agreement, Lopez also received certain

benefits from the government.  Lopez stated he understood. [Id., Ex. D42.]

26.     The Magistrate Judge then summarized the benefits Lopez was receiving.  Lopez

stated he understood.  [Id., Ex. D42-43.] At that point, the Court discussed deportation again.

> Court:  You're also going to be deported because there's a mandatory
> deportation provision because you're pleading to a drug
> offense – two drug offenses, do you understand?
>
> Lopez: Yes, ma'am.
>
> . . .
>
> Court:  Okay.  So you will plead separate to deportation proceedings, do you
> understand?
>
> Lopez: Yes, ma'am.

[Id., Ex. D43.] When asked if Lopez had any other questions, he did not.  [Id., Ex. D44.]

27.     Before asking Lopez for his plea, the Court asked if he understood that he admitted

certain facts in the plea agreement, *i.e.,* the facts that supported each of the elements of the two

crimes, and if he agreed that the government could prove all of those facts beyond a reasonable

doubt if Lopez proceeded to trial.  Lopez understood and agreed. [Id.]

28.     Magistrate Judge Martinez asked Lopez if he admitted to each of the facts that

supported the elements of the charge and if he agreed to how the stop was made on the date in

question. [Id., Ex. D45-46.] Lopez understood and agreed.

29.     While Lopez testified he did not know what his co-defendant told the agents during the stop, Lopez agreed that Attorney Rey told Lopez that Oquedo, his co-defendant, stated he knew there were drugs in the vehicle.  Thus, Lopez was aware of his co-defendant's statement to agents and also agreed that he learned his co-defendant told the agents there were approximately 8 kilos of cocaine in the vehicle. [Id., Ex. D47-49.] Lopez admitted that the total weight of the cocaine, with packaging, was 9.97 kilograms. [Id.]

30.     At the hearing, while Lopez did not admit he was the one to arrange the actual transport of the cocaine or that he solicited the co-defendant to drive the vehicle, he agreed that his attorney informed him that Oquedo conveyed this information to agents.   [Id., Ex. D50.]

31.   When asked to describe the felony crimes in his words, Lopez stated: "I knew that we [he and Oquedo] were going to commit a crime."   [Id., Ex. D50-51.] He stated the crime he committed was "transport drugs" and that he knew they were "going to transport drugs."  He also knew they had drugs in the car when they were stopped.  [Id., Ex. D51-52.] When the government read the detailed factual basis for the crimes, Lopez agreed the facts were true as they pertained to him.  He further stated he had 8 kilos of cocaine and worked together with Oquedo in transporting the drugs.  [Id., Ex. D51-55.]

32.     Lopez pled guilty to the charges of conspiracy to possess with the intent to distribute 5 kilograms or more of cocaine and possession of the same. [Id., Ex. D55.] The Court accepted Lopez's plea after finding he was fully competent and capable of entering an informed plea and that the plea was voluntarily and knowingly made. [Id., Ex. D56.]

33.     On October 5, 2011, the District Court entered Judgment in the case, finding that Lopez plead guilty to the two-count Information.  The Court sentenced Lopez to a term of 46 months custody and recommended that Immigration and Customs Enforcement begin removal proceedings

11

during service of the sentence. [Doc. 55, Ex. D13.] Special conditions of supervision directed that

Lopez "must not reenter the United States without legal authorization." [Id., Ex. D15.]

34.     On October 4, 2012, Lopez filed the present § 2255 motion, alleging ineffective

assistance of counsel in relation to lack of advice about the "deportation immigration consequences

for entering a plea of guilty," and further alleging that Lopez's "plea admonishment, together with

inaccurate and misleading advice from counsel, violates the Fifth Amendment Due Process." [Doc.

1, at 1, 5.] The Court notes that the second issue, an alleged violation of Fifth Amendment rights,

is minimally briefed.

## Legal Standard

35.     Ineffective assistance of counsel claims are analyzed under Strickland v. Washington,

466 U.S. 668, 104 S.Ct. 2052, *reh'g denied*, 467 U.S. 1267 (1984).  The Strickland analysis applies

to plea proceedings.  Hill v. Lockhart, 474 U.S. 52, 62 (1985) (holding for the first time that the

two-part Strickland v. Washington test applie[d] to challenges to guilty pleas based on ineffective

assistance of counsel).  Before deciding whether to plead guilty, a defendant is entitled to effective

assistance of competent counsel.  Padilla v. Kentucky, 130 S.Ct. 1473, 1481 (2010); Strickland, 466

U.S., at 686.  In Padilla, the United States Supreme Court held that defense counsel may render

ineffective assistance by failing to advise the defendant that his guilty plea would subject him to

deportation.  Padilla, 130 S.Ct. at 1482–84.

36.     To satisfy the Strickland requirements, the movant must prove that trial counsel

"made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth

Amendment."  Id. at 687.  Second, in the context of guilty pleas, the defendant will have to show

'a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would

have insisted on going to trial.'"  Missouri v. Frye, 132 S.Ct. 1399, 1409 (2012) (*quoting* Hill, 474

U.S. at 59), *cert. denied*, 132 S.Ct. 1789 (2012); United States v. Hamilton, 510 F.3d 1209, 1216 (10th Cir. 2007), *cert. denied*, 552 U.S. 1331 (2008). Defendant has the burden of satisfying both elements of the Strickland inquiry. *See* Byrd v. Workman, 645 F.3d 1159, 1167 (10th Cir.) (explaining that the movant "must show both that his counsel's performance 'fell below an objective standard of reasonableness,' and that 'the deficient performance prejudiced the defense.'") (*relying* on Strickland, 466 U.S. at 687-88), *cert. denied*, 132 S.Ct. 763 (2011)). If the movant is unable to show either "deficient performance" or "sufficient prejudice," the ineffective assistance claim necessarily fails. Hooks v. Workman, 606 F.3d 715, 724 (10th Cir. 2010).

37.     In Strickland, the United States Supreme Court emphasized that judicial scrutiny of counsel's performance must be highly deferential. Strickland, 466 U.S. at 687. A court should not second-guess counsel's representation after an adverse verdict or sentence. An attorney's performance should be evaluated from counsel's perspective at the pertinent time, thereby eliminating any distorting effects of hindsight. A court must indulge a strong presumption that counsel's conduct was reasonable and could have been considered sound trial strategy. Id. To be constitutionally deficient, an attorney's performance "must have been completely unreasonable, not merely wrong." Byrd, 645 F.3d at 1168.

## Analysis

## I.     Alleged Ineffective Assistance of Counsel for Failure to Provide Information of Immigration Consequences of Guilty Plea

### A.     *Pleadings and Argument:*

38.     Lopez argues that his attorney, Rey, did not advise him of the "succinct, clear and explicit" deportation immigration consequences of entering into a guilty plea. [Doc. 1, at 4.] Lopez states that if he had known he would be subject to "presumptive mandatory deportation by pleading

guilty, he would have asked for a jury trial. . . ." [Id.] Lopez further asserts that had he known of the immigration consequences of a guilty plea, he would have asked his attorney to seek a plea agreement that did not have a presumptive mandatory deportation consequence.  According to Lopez, based on his long-time residency in the United States, he would have "risked a longer prison term for the chance, however slight, that a jury would render a not guilty verdict in order for him to not be separated from his family." [Id.] [*See also* Doc. 1-13 or Ex. E1, Lopez Aff., at p.3.]

39.     Lopez also contends that the plea agreement language concerning immigration consequences was "not adequate to advise [him] of the 'succinct, clear and explicit' nature of pleading guilty to a drug trafficking crime" and that the written plea "admonishment is factually and legally inaccurate." [Doc. 1, Pre-Trial Memo, at 6.] For example, Lopez argues that the written plea "admonishment states that 'no one . . . can predict to a certainty the effect' of a drug trafficking conviction.  This is patently false and only underscores the importance of 'accurate immigration advice' for non-citizens accused of a crime." [Id. at 6-7.]

40.     Lopez asserts that deportation, under the circumstances of his guilty plea, *i.e.,* his non-citizenship and conviction for an "aggravated felony" drug trafficking crime, was a certainty. However, he argues that the fact that he would never be allowed to return to the United States after deportation was not sufficiently explained to him by counsel. [Id. at 6-7.] "In short, Francisco Adan Lopez . . . entered into a plea bargain which guaranteed his deportation and banishment from his wife, three children, friends and associates in the United States for the remainder of his life." [Id. at 8.]

41.     In Lopez's affidavit, he asserts a number of complaints about his attorney's performance, including that he did not feel Attorney Rey asked him enough questions about his case, Rey was 15 minutes late to the first hearing, Rey told Lopez he had nothing to worry about, neither

Ray nor his wife could reach Rey to get an update on his case, Rey told Lopez that his nephew co-defendant placed all of the blame on Lopez and that if Lopez went to trial he would lose and could do 15 years in jail. [Doc. 1-13.] According to Lopez, based on Rey's advice, Lopez agreed to plead guilty, but he argued that Rey did not tell Lopez that by signing the plea agreement, he would be deported. [Id. at 3.]   Even though the "judge mentioned deportation when [he] plead guilty," Lopez believed that Rey had told him he could "fight to stay" in the United States.  [Id., at 10-11; Doc. 1-13, at 4.]

42.      In his affidavit, Lopez stated:

> While I sat in the court room Mr. Rey came up beside me and asked me to sign some papers.  I asked him what it was because the papers were in English.  He said that the papers were to show that we agree not to go to trial and were going to cooperate with the government. I want to make myself even more clear on this, he did not tell me that by signing I was pleading guilty and agreed to the time that was being offered not knowing how long it was going to be.  Mr. Rey did not tell me that by pleading guilty, because I was a legal resident and not a U.S. citizen, I would be deported.

[Doc. 1-13, at 3.] According to Lopez when he asked Rey about his (Lopez's) "residency papers," Rey told him that once Lopez got out of jail, he could fight for them and that Rey never told him that Lopez would have problems with immigration and that he would be deported. [Id. at 4.]

43.      In its response, the government emphasizes the language of the plea agreement, the plea agreement provision clearly outlining immigration consequences of pleading guilty, the fact that Lopez signed the agreement, stating it had been read to him in the language he understood best, and the portions of the plea transcript indicating the Court thoroughly discussed Lopez's legal representation with him, along with the immigration consequences of pleading guilty. [Doc. 8, at 4-6.] The government further highlighted the Court's effort to ensure that the plea agreement, the entirety of it, was read to Lopez in Spanish. [Id., at 5.]

15

44.     The government agrees that <u>Padilla</u> instructs that an attorney must inform his client whether his plea carries a risk of deportation. [<u>Id.</u> at 8.] However, the government asserts that the record indicates that Lopez was so instructed, in accordance with requirements under <u>Padilla</u>. [Doc. 8, at 19-22.] Moreover, according to the government, Lopez's attorney met his professional obligations under <u>Padilla</u> by advising Lopez, prior to the plea hearing, that he would be deported from the United States as a result of the conviction. [Doc. 8, at 21.]

45.     In addition, the government contends that Rey's performance was constitutionally sufficient based on counsel's successful negotiation of a plea agreement that resulted in a 46-month sentence, a substantial reduction from the 121 to 151 month sentence that Lopez faced without the benefit of the plea agreement.  Moreover, the government argues that Lopez's assertion that he would have insisted that his attorney obtain a different plea agreement, without the mandatory removal provision, is unavailing.  The government states that such "creative plea bargaining" was not available.  "Mr. Rey's and the Government's hands were tied by the nature of the charges Mr. Lopez was facing, which effectively eliminated Mr. Rey's ability to '"plea bargain creatively'" as to the immigration consequences of a guilty plea. [Doc. 8, at 22.]

46.     The government also attached two affidavits in support of its response – one by Lopez's co-defendant nephew ("Carlos") and another by a different nephew ("Christian").  Lopez's nephew, Christian (brother of co-defendant Carlos), provided an affidavit, stating he was present in the courtroom when Lopez and his attorney were speaking, prior to Lopez's entry of a guilty plea. [Doc. 8, Ex. 1, Christian Oquedo Aff., at ¶ 4-7.] Prior to the beginning of the hearing, Christian heard Attorney Rey speaking to Lopez, who was seated two rows in front of Christian.  According to Christian, who claims to be fluent in Spanish, Rey spoke Spanish to Lopez and asked Lopez if

he was aware that he would be deported from the United States.  Christian observed his uncle (Lopez) nod his head yes, indicating he knew he would be deported. [Id., ¶¶ 8-12.]

47.    Carlos's affidavit states that he was in the same jail with his uncle Lopez after their arrests.  Carlos claims that Lopez told him, during a conversation in jail, that Carlos should take responsibility for the crimes and plead guilty.  Carlos alleges that Lopez advised him to tell authorities that Lopez was not involved in the crime and did not know about the drugs.  Carlos also asserted that Lopez stated he would help pay for an attorney for Carlos if Carlos admitted responsibility.  Carlos states that Lopez told Carlos the reason he wanted Carlos to take responsibility was because Lopez did not want to be deported from the United States. [Doc. 8, Ex. 2, Carlos Oquedo-Flores Aff., at ¶¶ 1-6.] Thus, based on the record, along with the affidavits, the government argues that Lopez clearly was aware of immigration consequences of the conviction at issue.

48.    The government further asserts that a defendant cannot demonstrate prejudice by an alleged failure of counsel to inform him of the risk of removal attending his plea when he was informed of the risk by other sources. [Doc. 8, at 15] (*citing* United States v. Gomez-Lugo, 410 F. App'x 148, 150 (10th Cir. 2011) (unpublished) (prejudice cannot be established where defendant read and reviewed PSR plainly informing him that he could be deported) and United States v. Gomez-Alvarez, No. 11-3218, 2012 WL 1949329, at *5 (10th Cir. 2012) (unpublished) (prejudice not established where defendant responded affirmatively when asked if informed of the consequences of guilty plea that included potential removal)).

49.    In Lopez's reply, he addresses the nephews' affidavits and emphasizes that the government did not provide an affidavit from attorney Rey. [Doc. 9, at 2.] He further argues that the Court should disregard Carlos's affidavit because Carlos has reason to provide false testimony, for

providing substantial assistance in investigating or prosecuting another person. [Id.] (*citing* Fed. R. Crim. P. 35(b)(1)).  Lopez challenges the content of Carlos's affidavit and provides another affidavit statement, denying that he asked Carlos "to take the blame." [Doc. 9, Ex. 1, at 2-3.] He also asserts in the affidavit that while Christian was sitting in the courtroom when Rey spoke to Lopez, Christian could not have heard what Rey discussed with Lopez.  Rey spoke very softly so that others around Lopez could not have heard. [Id.]

50.    Lopez continues to assert that he was not aware of the "drastic immigration consequences at the time of his guilty plea."  He repeats that Rey did not advise him of the immigration consequences of the plea, arguing that a defense attorney cannot hide behind the statutory admonishment required of the trial judge to satisfy the attorney's Sixth Amendment duty to provide accurate legal advice. [Doc. 9, at 9.]

### B.    Discussion:

51.    The Court provides a detailed account of the proceedings and argument (*see supra*) because of the importance of the issue.  For example, the Supreme Court noted that: "[t]he weight of prevailing professional norms supports the view that counsel ***must*** advise her client regarding the risk of deportation."  Padilla, 130 S.Ct. at 1482 (citation omitted) (emphasis added).  Moreover, in Padilla, the high Court recited its previous recognition that " '[p]reserving the client's right to remain in the United States may be more important to the client than any potential jail sentence.' "  Id. at 1483 (citation omitted).  Notwithstanding the importance of the issue, particularly in view of circumstances where the convicted individual is a longstanding legal resident, without any prior criminal history, the facts of this case do not present a close call.

52.    The record, including the written plea agreement and the transcript of the plea hearing, conclusively demonstrate that Rey fully informed Lopez of the immigration consequences

of a guilty plea.  In addition, the facts show that Lopez was thoroughly informed of the immigration consequences of his guilty plea, both by counsel and the Court.

53.     First, the plea agreement clearly and succinctly sets forth the consequences of Lopez's guilty plea negotiation by stating Lopez recognizes that "pleading guilty may have consequences with respect to defendant's immigration status if defendant is not a citizen of the United States." [Doc. 46, at 7, ¶ 13.] The plea agreement further provides, in writing, that in accordance with federal law, certain offenses, including the charges to which Lopez was pleading guilty, meant removal was "presumptively mandatory." [Id.] In this case, the record reveals that the immigration consequences of Lopez's guilty plea could not have been clearer.  Attorney Rey negotiated a plea agreement between Lopez and the government with the unavoidable consequence that Rey would be removed from the United States once he served his negotiated term of incarceration.

54.     Second, Lopez did not have to agree to these terms; he did not have to sign the plea agreement.  However, he did sign the plea agreement, thereby stating the plea agreement was read to him in the language that he understood best and further that he had "carefully discussed *every part*" of it with his attorney.  Lopez also agreed that he understood the terms of the agreement and "the consequences of entering into this agreement." [Doc. 46, at 10] (emphasis added).

55.     The language in the plea agreement is enough to demonstrate Rey had informed Lopez of the immigration consequences and that Lopez was fully informed of those consequences before entering into the plea agreement.  However, in addition, the Court repeatedly addressed this issue during the plea proceeding ensuring that Lopez understood the consequences of his guilty plea.

56.     During the plea proceeding, the Court specifically informed Lopez that one of the consequences of his guilty plea, based on his status in the country and the charges he faced, was that

it was "almost certain you will be deported from this country and you won't be allowed to return again illegally without facing further serious Federal charges." [Doc. 1, Ex. D31.] Lopez, who had sworn to tell the truth, stated he understood these consequences. If Lopez had not understood those consequences because he had never read the plea agreement or never heard it read to him in Spanish, he was free to disagree with the Court and to ask additional questions of the Court about the immigration consequences. He did not do so. At no time during the pleading, even when asked if he had any other questions about any provision, did Lopez indicate he did not understand the immigration consequences. Later in the proceeding, however, Lopez asked additional questions of the Court about waiver of his right to appeal. Thus, Lopez was able to ask questions when confused.

57. The Court also made sure that the plea agreement was read to Lopez in Spanish before he signed it. While Lopez initially said he did not remember if it was read to him in Spanish, the Court engaged in a thorough discussion with counsel as to whether Rey read the plea agreement to Lopez in Spanish. To some degree, the Court challenged Lopez's attorney's representations in this regard, to ensure that Rey had read the agreement to Lopez "word for word." [Doc. 1, Ex. D34-35.] The Court continued to make inquiries of Rey as to whether he "read every other provision [including the charge and maximum penalty provisions] to [Lopez] in Spanish? [Doc. 1, Ex. D35.] Rey told the Court: "Yes, ma'am. The Court followed up with Lopez as to whether this discussion refreshed Lopez's memory that the plea agreement was read to him in Spanish. Lopez answered: "Yes, ma'am." Not quite satisfied, the Court asked Lopez if he was sure. Lopez again answered: "Yes, ma'am." [Id.] Lopez was free to state then that Rey did not read him the agreement in Spanish or to make further inquiries or complaints about his understanding of the immigration consequences. He did not. Lopez agreed that he "under[stood] fully and completely each and every provision of [his] plea agreement. [Id., Ex. D36.]

20

58.     When the Court asked if Lopez had any questions about his plea agreement, about those provisions regarding waiver of appeal or "any other provisions," Lopez asked only about his right to appeal. [Id., D41.]

59.     Finally, in discussing the benefits Lopez received from the plea agreement, the Court returned yet again to the issue of immigration consequences.  Magistrate Judge Martinez specifically informed Lopez that he was "going to be deported because there's a mandatory deportation provision because you're pleading to a drug offense – two drug offenses, do you understand?" Lopez again testified that he understood these consequences. [Id., D43.] Lopez was under oath to tell the truth.

60.     After agreeing that the government could prove the factual basis for Lopez's crimes, Lopez knowingly and voluntarily plead guilty. [Id., D55.]

61.     The Court finds that Lopez's attorney explicitly informed Lopez of the immigration consequences of his guilty plea.  Here, counsel stated that he read the entire plea agreement, including the provision regarding specific immigration consequences, to Lopez in Spanish prior to Lopez signing the plea agreement.  The Court is permitted to rely on counsel's representations to the Court because counsel is an officer of the court.  See Irving v. Mississippi, 441 U.S. 913, 915 (1979) ("[A]ttorneys are officers of the court, and 'when they address the judge solemnly upon a matter before the court, their declarations are virtually made under oath.'") (citations omitted). Moreover, the Court presumes that an attorney's conduct was within the wide range of professional conduct.  Strickland, 466 U.S. at 689.  The Court concludes, therefore, that Lopez failed to establish the first prong of the Strickland test –  that trial counsel's representation fell below "an objective standard of reasonableness."

21

62.     In light of the Court's careful and thorough plea colloquy, the parties' written plea agreement, and Lopez's testimony that he understood the possible deportation consequences of pleading guilty, the Court finds that Lopez was sufficiently advised of the deportation consequences of his plea, and that his counsel's performance did not fall below an objective standard of reasonableness.  Failure to meet one prong of the <u>Strickland</u> test provides sufficient grounds to recommend denial of the ineffective of assistance of counsel claim.  *See, e.g.,* <u>Weedman v. Hartley</u>, 396 F. App'x 556, 561 (10th Cir. Oct. 5, 2010) (unpublished) (because Weedman failed to satisfy the first prong of the <u>Strickland</u> test, court need not even analyze the second prong).  However, the Court elects to proceed to the second prong of the test, finding that Lopez also failed to demonstrate prejudice.

63.     Lopez argues that had he known of the immigration consequences, he either would have insisted on going to trial or he would have required his counsel to reach a plea agreement with the government that limited immigration officials' rights to remove him. Lopez's argument assumes, with no support for the assumption, that such a plea agreement would have been extended.  Indeed, the government stated such a "creative agreement" was not available. Thus, the Court rejects this argument as demonstrating prejudice.

64.     Lopez also argued that he surely would have proceeded to trial, regardless of the outcome, in the hope that he might be acquitted.  He stated he would have gone to trial even in the face of conviction and a longer sentence based on the hope of acquittal.  Under the circumstances of this case, his argument defies credulity.  First, he provides no argument as to why he might have been acquitted although the Court recognizes that there is no requirement of an affirmative demonstration of likely acquittal at trial to prove prejudice.  Second, his plea agreement resulted in a 46-month term of incarceration, when he faced a mandatory minimum sentence of ten years.  It

is difficult to believe that Lopez, who never contends that he was innocent and never denies that the government could prove its case, would have willingly gone to prison for ten years, simply to be deported upon completion of his sentence.  Third, the Court is entitled to rely on Lopez's sworn testimony that he understood and was aware of the consequences of his guilty plea, including the promise of mandatory removal from the country, and his voluntary and knowing entry of the guilty plea.  *See* Gomez-Lugo, 410 F. App'x at 150-51 (no prejudice established where facts demonstrated defendant was aware he would be deported).  *See also* Freeman v. U.S., 2011 WL 6056615, *3 (C.D. Ill. Dec. 6, 2011) (unpublished) (court entitled to rely on a defendant's sworn testimony at a plea proceeding as to counsel's performance, as well as regarding the defendant's knowing and voluntary guilty plea and acceptance of a plea agreement at the plea colloquy) (*citing* United States v. Chapa, 602 F.3d 865, 869 (7th Cir. 2010)).

65.     In this case, during the plea proceeding, Lopez testified under oath that he understood the consequences of his plea, including the consequences of removal from the country, that his attorney read the plea agreement to him in Spanish, that he understood the changes he faced, that he agreed the government could prove the facts that formed the bases of the charges against him, and that he was satisfied with his attorney's representation.  He did not dispute the accuracy of the underlying facts giving rise to his guilty plea. He admitted in open court that he was guilty of the crimes for which he was convicted.  He further testified that he knowingly and voluntarily entered into the guilty plea.  If he was confused at all with his plea agreement, he had multiple opportunities to make inquires of his Court of counsel at the proceeding, but failed to do so.  "[A] plea colloquy is not merely a customer satisfaction survey."  Freeman, 2011 WL 6056615, *3.  Lopez cannot escape the presumption of truthfulness to which his sworn testimony is entitled, and the Court is allowed to rely on his testimony.

66.     Moreover, Lopez's subsequent self-serving allegations are contradicted by his earlier sworn testimony before the Court and contradicted by his attorney's representations during the plea colloquy.   Lopez's self-serving affidavits do not demonstrate prejudice, particularly in view of the explicit and detailed provisions of the plea agreement, along with the comprehensive plea colloquy.

67.     Lopez's case is not analogous to the facts in Padilla.   There, the Court determined that counsel could have easily determined that Padilla's "plea would make him eligible for deportation simply from reading the text of the statute, which addresses not some broad classification of crimes but specifically commands removal for all controlled substances convictions except for the most trivial of marijuana possession offenses." Padilla, 130 S.Ct. at 1483.   However, in Padilla, the attorney mislead the defendant and provided false assurance that his client's conviction would not result in his removal from this country.   Id.   Under those circumstances, it was not difficult for the Court to find deficient performance by counsel.   Id.   Such is not the case here. Lopez's attorney provided him with accurate information about the immigration consequences of guilty plea, as did the written plea agreement, as did the Court during the plea proceeding.

68.     Lopez also relied on a Third Circuit decision, United States v. Orocio, 645 F.3d 630 (3d Cir. 2011).   That case is distinguishable and has no bearing on this matter.   Orocio concerned a plea agreement entered into by the defendant in 2004, and whether Padilla would apply retroactively to that conviction.   In Orocio, there was no evidence that his attorney had informed him of the immigration consequences of a guilty plea, and the Court held that Orocio had alleged a prima facie ineffective assistance claim under Padilla, based on those circumstances.   The same is not true here.   As discussed above, there is ample evidence of Lopez's knowledge concerning immigration consequences of his guilty plea.

24

69.     The Court concludes that Lopez did not satisfy his burden of showing a "reasonable probability, but for counsel's alleged error, he would not have pleaded guilty and would have insisted on going to a trial." Hill, 474 U.S. at 59.  Therefore, the Court recommends that the ineffective assistance of counsel claim be denied and dismissed.

## II.     <u>Alleged Due Process Violation</u>

70.     Lopez devotes about four paragraphs to the argument that paragraph 13 of the plea agreement, informing Lopez of the immigration consequences of a guilty plea, is "confusing, murky and vague" and "appears to be 'boilerplate language' used in all criminal cases involving criminal aliens." [Doc. 1, at 23-25.] In support of the argument, Lopez relies on a social security case addressing issues of boilerplate language.  Lopez argues that the plea agreement's "advisory on immigration consequences violates the Fifth Amendment. . . ."

71.     Lopez's Fifth Amendment claim is unclear.  If it is premised on an argument that Lopez's guilty plea was taken involuntarily, unintelligently, and unknowingly in violation of the Fifth Amendment's due process clause, based on "murky" language in the plea agreement, the Court rejects this position.  The facts, described fully above, demonstrate that Lopez's attorney and the Court fully informed Lopez of the consequences of his guilty plea.  There is no evidence that counsel made misrepresentations to Lopez nor is there evidence that the language contained in the plea agreement, as discussed with Lopez both by his attorney and the Court in multiple instances, was vague or confusing.  Lopez testified in open court that he understand the immigration consequences that were clearly explained to him.

72.     A valid guilty plea must be knowingly, intelligently, and voluntarily made. *See* United States v. Gigot, 147 F.3d 1193, 1197 (10th Cir. 1998); *see also* Fed.R.Crim.P. 11.  Here, the Court finds no other evidence to indicate that Lopez's guilty plea and plea agreement were not

voluntary, knowing, and intelligent. The record indicates that Magistrate Judge Martinez carefully and thoroughly fulfilled the requirements set out in Rule 11 and those announced in <u>Gigot</u> to ensure the validity of the plea.  For example, the Court verified a factual basis for the plea, fully questioned Lopez and confirmed that he fully understood the charges against him and the consequences of the plea, including immigration consequences, explained the terms and conditions of the proposed plea agreement, and otherwise ensured that the plea was freely, voluntarily, and intelligently made. Lopez failed to put forward any evidence or colorable argument that would challenge the validity of the plea or plea agreement or that would demonstrate he lacked notice of the immigration consequences of his plea agreement, based on an argument that the language in the agreement was allegedly vague.

73.    Therefore, the Court recommends that the Fifth Amendment claim, to the extent Lopez successfully stated a claim under Fed. R. Civ. P. 12(b)(6), be denied and dismissed.

## <u>Recommended Disposition</u>

That Lopez's § 2255 motion be denied and that this matter be dismissed, with prejudice.

That under Rule 11 of the Rules Governing Section 2255 cases and 28 U.S.C. § 2253(c)(2), a certificate of appealability not issue because Lopez failed to make a substantial showing that he has been denied a constitutional right.

_Lorenzo F. Garcia_
Lorenzo F. Garcia
United States Magistrate Judge